DREW, J.
 

 _[iKeyona Davis appeals a judgment sustaining Dr. Glenda Johnson’s exception of prescription and/or peremption and dismissing her medical malpractice suit filed on behalf of her son Kyren Davis.
 
 [1]
 

 We affirm.
 

 FACTS
 

 Keyona Davis gave birth to Kyren Davis on December 29, 2005, at Schumpert Hospital. The next day, Dr. Glenda Johnson, Ms. Davis’s ob-gyn doctor, circumcised Kyren.
 

 Over the course of the next year, Ms. Davis became concerned about the appearance of her son’s penis. She raised these concerns with her son’s pediatrician, Dr. Henson, but was reassured that everything was normal.
 

 Dissatisfied with Dr. Henson’s treatment of her son regarding other health matters, Ms. Davis took him to see a pediatrician at the Family Practice Center at LSUHSC in Shreveport for an examination on February 9, 2007. Kyren was subsequently referred to the urology clinic at LSUHSC for evaluation of a retracted testicle. At this evaluation, which was performed on April 4, 2007, it was noted that Kyren’s penis had a lot of inner foreskin and a shortened amount of outer foreskin. A revision of the circumcision was performed on May 25, 2007.
 

 On April 1, 2008, Davis filed a claim for medical malpractice against Dr. Johnson and Schumpert. Dr. Johnson filed the exceptions of prescription and/or peremp
 
 *441
 
 tion in which she contended that Davis knew or | .¿should have known of facts sufficient to put her on notice of a possible malpractice claim by February 9, 2007, at the latest.
 

 The trial court granted the exception. In its reasons for judgment, the trial court noted that Ms. Davis’s deposition testimony revealed that she had enough notice to excite attention, put herself on guard, and call for inquiry at some point in 2006. The trial court added that even when interpreting the facts in a light most favorable to Ms. Davis, it concluded that she possessed a level of knowledge sufficient to commence prescription on February 9, 2007.
 

 Ms. Davis has appealed. She argues that it was not until April 4, 2007, that Dr. Johnson’s negligence could have reasonably been discovered by her. She further argues that until that time, she had no knowledge that the representations of her son’s treating physicians had been incorrect.
 

 DISCUSSION
 

 The party raising the exception of prescription ordinarily bears the burden of proof at the trial of the peremptory exception.
 
 Spott v. Otis Elevator Co.,
 
 601 So.2d 1355 (La.1992). However, when prescription is evident from the face of the pleadings, the plaintiff bears the burden of showing the action has not prescribed.
 
 Id.
 

 When evidence is introduced at the hearing on the peremptory exception of prescription, the district court’s findings of fact are reviewed under the manifest error-clearly wrong standard of review.
 
 Carter v. Haygood,
 
 2004-0646 (La.1/19/05), 892 So.2d 1261.
 

 |sThe time period allowed for bringing a medical malpractice claim is set forth in La. R.S. 9:5628(A):
 

 No action for damages for injury or death against any physician ... arising out of patient care shall be brought unless filed within one year from the date of the alleged act, omission, or neglect, or within one year from the date of discovery of the alleged act, omission, or neglect; however, even as to claims filed within one year from the date of such discovery, in all events such claims shall be filed at the latest within a period of three years from the date of the alleged act, omission, or neglect.
 

 In order to soften the occasional harshness of prescriptive statutes, our courts have recognized a jurisprudential exception to prescription:
 
 contra non valentem agere nulla currit praescriptio,
 
 which means that prescription does not run against a person who could not bring his suit.
 
 Harvey v. Dixie Graphics, Inc.,
 
 593 So.2d 351 (La.1992).
 
 Contra non valentem
 
 in medical malpractice suits is embodied in La. R.S. 9:5628.
 
 White v. West Carroll Hospital, Inc.,
 
 613 So.2d 150 (La.1992);
 
 Edwards v. Alexander,
 
 42,000 (La.App.2d Cir.6/6/07), 960 So.2d 336.
 

 The doctrine of
 
 contra non va-lentem
 
 acts as an exception to the general rules of prescription by suspending the running of prescription when the circumstances of the case fall into one of four categories. Prescription is suspended under the fourth category of
 
 contra non va-lentem
 
 when “some cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant.”
 
 Wimberly v. Gatch,
 
 93-2361 (La.4/11/94), 635 So.2d 206, 211. Commonly known as the discovery rule, this category provides that prescription commences on the date the injured party discovers or should have discovered the facts upon 14which his cause of action is based.
 
 Id.
 
 For this category to apply, the plaintiffs ignorance of his cause of action
 
 *442
 
 cannot be attributable to his own willfulness or neglect, as a plaintiff is deemed to know what he could have learned by reasonable diligence.
 
 Renfroe v. State ex rel. Dept. of Transp. and Development,
 
 01-1646 (La.2/26/02), 809 So.2d 947.
 

 In
 
 Campo v. Correa,
 
 01-2707, pp. 11-12 (La.6/21/02), 828 So.2d 502, 510-11, the supreme court explained the importance of the reasonableness of a plaintiffs action or inaction in determining whether the date of discovery interrupted prescription under La. R.S. 9:568(A):
 

 Prescription commences when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort. A prescriptive period will begin to run even if the injured party does not have actual knowledge of facts that would entitle him to bring a suit as long as there is constructive knowledge of same. Constructive knowledge is whatever notice is enough to excite attention and put the injured party on guard and call for inquiry. Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry may lead. Such information or knowledge as ought to reasonably put the alleged victim on inquiry is sufficient to start running of prescription. Nevertheless, a plaintiffs mere apprehension that something may be wrong is insufficient to commence the running of prescription unless the plaintiff knew or should have known through the exercise of reasonable diligence that his problem may have been caused by acts of malpractice. Even if a malpractice victim is aware that an undesirable condition has developed after the medical treatment, prescription will not run as long as it was
 
 reasonable
 
 for the plaintiff not to recognize that the condition might be treatment related. The ultimate issue is the
 
 reasonableness
 
 of the patient’s action or inaction, in light of his education, intelligence, the severity of the symptoms, and the nature of the defendant’s conduct.
 

 Citations omitted.
 

 The malpractice claim states that it arises out of care and treatment provided to Kyren in December of 2005. The claim does not state that it | Swas filed within one year of the date of discovery of the alleged malpractice; rather, it merely states that Kyren “later developed problems which [Ms. Davis] later learned were due to an improperly done circumcision.” Because the claim was not filed until April of 2008, it is prescribed on its face.
 

 Ms. Davis testified in her deposition that Dr. Johnson went over the risks of the circumcision with her, including the risks of poor cosmetic results and of removing too much or too little skin, before getting her consent to perform it. On the list of material risks accompanying the consent form, the aforementioned risks were under the category of uncommon risks.
 

 Ms. Davis testified that when Kyren’s penis healed following the circumcision, she did not like how his penis looked because there were small bumps where extra skin was. Therefore, she complained to Dr. Henson about the penis several times in 2006, but Dr. Henson said the penis looked fine and only had some extra fatty tissue that would go away as Kyren grew older. Despite Dr. Henson’s reassurances, Ms. Davis still did not like the way the penis looked, and she questioned whether the circumcision had been properly done.
 

 Ms. Davis ceased having Dr. Henson treat her son and took him to the Family Practice Clinic at LSUHSC in 2007 because she was not satisfied with Dr. Henson’s treatment of her son, especially after Dr. Henson failed to diagnose an ear infec
 
 *443
 
 tion in the latter part of 2006. Ms. Davis was also not |f,satisfied with Dr. Henson’s answers when she raised questions about the appearance of her son’s penis.
 

 Ms. Davis took Kyren to the Family Practice Center at LSUHSC on February 9, 2007, with the intent of getting her son an overall examination by a male doctor. She wanted an opinion from another doctor about the circumcision because she still had concerns about whether the circumcision had been done properly because Kyren’s penis did not look right to her, and she raised those concerns at LSUHSC. She asked Dr. Bergerone to examine the circumcision. Another physician at the Family Practice Clinic, Dr. German, referred Kyren to the Urology Clinic at LSUHSC. In his examination notes, Dr. Bergerone wrote that Kyren presented with a retracted testicle, and that the “foreskin [was] noted to be attached.”
 

 On April 4, 2007, Kyren presented at the Urology Clinic for evaluation of the retracted testicle, and was examined by Drs. Mata and Speeker-Cruit. Ms. Davis again related her concerns regarding the circumcision. The record from that visit states that Kyren’s penis appeared to have some redundant foreskin, but on further examination, it was noticed that it had a lot of inner foreskin and a shortened amount of outer foreskin, as well as circumferential penile adhesions to the glans. The record further stated that hydrocortisone cream would be tried for the adhesions, and a circumcision revision would be done per Ms. Davis’s request. Ms. Davis recalled that Dr. Mata asked her if she wanted the circumcision redone because extra skin remained.
 

 |7Ms. Davis explained that until April 4, 2007, she had no idea the circumcision had been done improperly. It was the appearance of the penis that drew her attention and she had had concerns about the circumcision, but had been reassured that all was right. Kyren never showed any discomfort because of the circumcision, and as he was a toddler during that time, she could not rely on complaints from him to arouse any suspicion in her mind.
 

 In the recent case of
 
 Williamson v. Hebert,
 
 2010-0071 (La.4/5/10), 31 So.3d 1047, the supreme court found that Hebert failed to establish that Williamson had constructive knowledge of the alleged medical malpractice more than one year prior to filing her complaint. Williamson had some apprehension that something was wrong following her surgery as she consulted with two doctors about her condition; however, both doctors assured her that her condition would continue to improve. When her condition did not improve within two years after her surgery, which is how long one of the doctors indicated it could take for her symptoms to resolve, Williamson researched her condition on the Internet and learned for the first time that her symptoms may have been caused by malpractice.
 

 Ms. Davis was reassured by at least one physician that everything was normal concerning the appearance of her son’s penis. Nevertheless, it seems that Ms. Davis’s concern was never truly satisfied as she repeatedly raised the issue with Kyren’s doctors, including the doctors at LSUHSC.
 

 Ms. Davis was 19 years old when Kyren was born. Upon graduation from Byrd High School in 2004, she attended nursing school in Shreveport |sfor a year. After Kyren was born, she studied to become a pharmacy tech at a career college, and is currently employed as a pharmacy tech at Wal-Mart. Although the focus at the February 2007 visit to the Family Practice Clinic was on the retracted testicle, Dr. Bergerone noted that Kyren’s foreskin remained attached. Clearly it was unreasonable for Ms. Davis not to recognize by at
 
 *444
 
 least February of 2007 that the undesirable condition of Kyren’s penis may have been related to the circumcision performed by Dr. Johnson.
 

 CONCLUSION
 

 The trial court was not clearly wrong in concluding that Ms. Davis had constructive knowledge of a possible medical malpractice claim no later than February of 2007. The exception of prescription and/or per-emption was properly granted. With Ms. Davis to pay costs of this appeal, the judgment is AFFIRMED.
 

 [1]
 

 . Defendant Christus Schumpert had been dismissed earlier.