BROWN, Chief Judge.
11 In this medical malpractice lawsuit, plaintiffs, Katrina Cothran, Joel Amos and Cheryl Scott, individually and on behalf of their father, Joseph Lee Amos, have appealed from a trial court judgment in favor of defendants, sustaining an exception of prescription as to the malpractice claim filed by Joseph Lee Amos prior to his death and granting summary judgment which dismissed their wrongful death claim. For the reasons set forth below, we affirm.

Facts and Procedural Background

On April 6, 2001, Joseph Lee Amos filed a medical malpractice complaint with the Patient’s Compensation Fund against Dr. Rebecca Crouch, a general surgeon practicing in Jackson Parish, Louisiana, and her insurer, Louisiana Medical Mutual Insurance Company (“LAMMICO”).
In his petition, Mr. Amos alleged that he began treatment with Dr. Crouch on April 12, 1999, when he presented with, inter alia, occasional rectal bleeding. Mr. Amos repeatedly complained of similar symptoms in his subsequent visits to Dr. Crouch. He last visited Dr. Crouch on January 3, 2000. A week later, January 11, 2000, on his own initiative and at the insistence of his family, Mr. Amos went to another physician at the Green Clinic in Ruston, Louisiana. At that appointment, a rectal examination showed a mass that appeared to be a cancer. This was confirmed by other tests. Mr. Amos was diagnosed with colorectal cancer, and he was treated with radiation, chemotherapy, and surgery.
In his complaint filed with the Patient’s Compensation Fund on April 6, 2001, Mr. Amos alleged medical malpractice related to Dr. Crouch’s | ^failure to recommend and conduct the proper diagnostic testing called for by Mr. Amos’s symptoms, which delayed an accurate diagnosis and treatment of his disease.
The medical review panel rendered its opinion on February 3, 2003. The review panel found that the appropriate standard of care was to have recommended further evaluation and diagnostic tests, including but not limited to ordering a barium enema with proctoscopy or a complete colo-noscopy. The issue of breach was deferred by the panel pending resolution of “material issues of fact.” In defendants’ submissions to the panel, it was asserted by Dr. Crouch that such tests were repeatedly recommended but refused by claimant. Mr. Amos, however, who was still living, submitted an affidavit in which he stated that such tests were never rec *1055 ommended to him and specifically that Dr. Crouch told him that he had a bad case of hemorrhoids and no further testing was needed.
Mr. Amos filed the instant lawsuit on April 26, 2008. He died on May 3, 2003, and the action was amended to add and substitute his surviving children, who asserted their father’s underlying malpractice claim as well as a wrongful death claim.[1] Defendants answered the lawsuit, then filed a motion for summary judgment which was granted by the trial court but reversed by this court. See, Amos v. Louisiana Medical Mutual Insurance Company, 41,302 (La.App.2d Cir.08/04/06), 936 So.2d 875. This court noted that “[w]hile Dr. Crouch’s records reflect her | ^recommendation of various tests and the patient’s acquiescence or refusal to undergo same, they do not reflect that she ever recommended a proctoscopy or colonosco-py.... The absence in Mr. Amos’s medical records of any notations indicating that Dr. Crouch recommended he undergo either a proctoscopy or colonoscopy is circumstantial evidence from which the trier of fact could reasonably conclude that Dr. Crouch never made any such recommendation.” Amos, 936 So.2d at 879-880. The matter was remanded.
On remand, defendants filed an exception of prescription and motion for summary judgment. As to prescription, defendants contend that the filing of the initial medical review complaint was untimely. They agree that the wrongful death claim was timely filed but subject to a summary judgment motion because plaintiffs would not be able to prove an essential element of their wrongful death claim, i.e., that the alleged malpractice was a proximate or legal cause of Mr. Amos’s death.
The trial court ruled in defendants’ favor by sustaining the exception of prescription as to the medical malpractice claim and granting summary judgment and dismissing plaintiffs’ wrongful death action. It is from this adverse ruling that plaintiffs have appealed.

Discussion

Malpractice action — Prescription
Plaintiffs first allege that the trial court erred in sustaining defendants’ exception of prescription. The alleged malpractice committed |4by Dr. Crouch is her failure to properly test, diagnose and treat Mr. Amos for his colorectal cancer.
Mr. Amos’s last visit to Dr. Crouch was January 3, 2000. Dr. Crouch did not refer him for testing or to another physician. A week later, on January 11, 2000, on his own initiative and at the insistence of his family, Mr. Amos went to another doctor presenting with the same rectal bleeding symptoms. Upon rectal examination, that physician found cancer. It is from this date, January 11, 2000, that defendants claim prescription began to run.
Dr. Crouch in her deposition states that on May 1, 2000, Mr. Amos called her wanting to continue treatment with her and in that conversation, Dr. Crouch terminated the doctor/patient relationship. Plaintiffs contend that this is the earliest date that prescription began to toll.
As stated above, the complaint with the Patient’s Compensation Fund was filed on April 6, 2001.
Louisiana Revised Statute 9:5628(A) provides that:
No action for damages for injury or death against any physician ... arising *1056 out of patient care shall be brought unless filed within one year from the date of the alleged act, omission, or neglect, or within one year from the date of discovery of the alleged act, omission, or neglect; however, even as to claims filed within one year from the date of such discovery, in all events such claims shall be filed at the latest within a period of three years from the date of the alleged act, omission, or neglect.
Prescription begins when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort. Campo v. Correa, 01-2707 (La.06/21/02), 828 So.2d 502; Davis v. Johnson, 45,200 (La.App.2d Cir.05/05/10), 36 So.3d 439. Constructive knowledge is notice enough to excite attention, to put the | ^injured party on guard, and to call for inquiry. Campo, supra; Succession of Mims v. Lifecare Hospitals, L.L.C., 43,770 (La.App.2d Cir.12/10/08), 1 So.3d 660, writ denied, 09-0289 (La.04/03/09), 6 So.3d 773. Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry may lead. Id. Such information or knowledge as ought to put the alleged victim on inquiry is sufficient to start the running of prescription. Campo, supra; Davis, supra. The ultimate issue is the reasonableness of the patient’s action or inaction, in light of his education, intelligence, the severity of the symptoms, and the nature of the defendant’s conduct. Campo, supra.
In reviewing a trial court’s ruling on a peremptory exception of prescription, a reviewing court will not disturb the factual conclusions of the trial court unless they are manifestly erroneous or clearly wrong. Taranto v. Louisiana Citizens Property Insurance Corp., 10-0105 (La.03/15/11), 62 So.3d 721; Davis, supra.
In brief, plaintiffs pose the essential question as being, “Does a diagnosis by a doctor rendering a second and correct opinion, equate to a per se reasonable belief that the previous treating physicians committed medical malpractice?” A bright line per se rule is not correct. Rather, the answer to the question depends on the particular circumstances of each case. The record in this case shows that Mr. Amos was a 61-year-old man who had recently returned to Louisiana from California. At the time he became concerned about the rectal bleeding, he was living in Jonesboro, working on a part-time basis as a custodian for Dr. Crouch. Thus, at the | fisame time he was being treated by her for symptoms related to his rectal bleeding and constipation, both of which became more frequent in occurrence over the course of time, he was also an employee of Dr. Crouch.
Mr. Amos’s age and education, together with the dual nature of his relationship with Dr. Crouch, as patient and employee, gives weight to plaintiffs’ contention that Mr. Amos had a more personal, trusting relationship with Dr. Crouch than he would have had with an unfamiliar physician. However, this does not translate into being unaware that the medical care he received from his doctor/employer was substandard.
Mr. Amos was not deposed before he died. He signed an affidavit for the medical review panel; however, it did not address when he suspected that he received substandard care from Dr. Crouch. In his affidavit, Mr. Amos states that when he was under Dr. Crouch’s care he continually was “hurting a lot” and that the blood was “bright red.” He saw Dr. Crouch on January 3 and a week later he decided that he needed to see another doctor. He went to see a doctor at the Green Clinic on January 11, 2000. His complaint was rectal bleeding. The physician’s report states that Mr. Amos said that Dr. Rebecca *1057 Crouch checked down there “and (Mr. Amos) was told everything was okay. However, he has continued to have problems. For that reason, he comes in to see me today.” Obviously, at that time Mr. Amos had questions about the quality (or lack thereof) of Dr. Crouch’s medical treatment.
Mr. Amos’s son-in-law, Billy Cothran, testified:
A. Okay. Well I feel that he did because we had to kind of convince him to go to another doctor to leave Dr. Crouch and 17consult another doctor. So I’d say, yes, he did trust (Dr. Crouch).
Cothran also testified that:
A. Yea, well he complained that Dr. Crouch had been treating him for hemorrhoids when in fact he had cancer.
Q. Okay
A. And he just felt that that was something that was pretty bad.
Q. And at the time he mentioned that to you was it soon after that that you suggested he hire a lawyer?
A. Well he had mentioned it to me early on after his, he first had the surgery and it was something that he would mention from time to time.
Factual conclusions by the trial court may not be disturbed unless manifestly erroneous or clearly wrong. The conclusion of the trial court that Mr. Amos had notice enough to excite attention, to put him on guard and call for inquiry when his cancer was diagnosed on January 11, 2000, is not clearly in error or manifestly wrong.
Wrongful Death Claim — Motion for Summary Judgment
Plaintiffs’ underlying medical malpractice claim is that Mr. Amos’s cancer would not have advanced to the point that his initial surgery in 2000 was required and would likely not have spread to his lungs had it been timely diagnosed and treated by Dr. Crouch. Plaintiffs point out that their wrongful death claim, although separate from the malpractice claim, likewise relates to Dr. Crouch’s failure to test for, diagnose and treat Mr. Amos’s cancer, which had spread and thereby caused him to need lung surgery.
| ^Clearance for the necessary lung surgery was not given because a heart problem, a blockage, requiring invasive cardiac treatment (placement of a stent), was discovered during Mr. Amos’s pre-operative examination. On April 28, 2001, a heart catheterization was performed and Mr. Amos went into cardiac arrest. Mr. Amos died on May 3, 2001, as a result of complications from the procedure.
Defendants correctly assert that Mr. Amos’s cancerous condition was not his actual cause of death. In fact, Mr. Amos died of complications from the outpatient heart procedure.
The medical review panel considered the issue of malpractice and found that there were material issues of fact. This court agreed in the first Amos case. The wrongful death complaint was filed after the MRP issued its opinion. In other words, the wrongful death claim was never submitted for review to the MRP.
A motion for summary judgment is a procedural device used when there is no genuine issue of material fact for all or part of the relief prayed for by a litigant. Samaha v. Rau, 07-1726 (La.02/26/08), 977 So.2d 880. A summary judgment ruling is reviewed on appeal de novo, with the appellate court using the same criteria .that govern the trial court’s determination of whether summary judgment is appropriate, i.e., whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law. Id.; Tillman v. Eldridge, 44,460 (La.App.2d Cir.07/15/09), 17 So.3d 69.
^Summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, to *1058 gether with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B). A fact is material if its existence or nonexistence may be essential to the plaintiffs cause of action under the applicable theory of recovery. Tucker v. American States Insurance, 31,970 (La.App.2d Cir.09/22/99), 747 So.2d 620.
If the movant for summary judgment will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the mov-ant’s burden on the motion does not require him to negate all essential elements of the adverse party’s claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action or defense; thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact. La. C.C.P. art. 966(C)(2).
The opponent cannot rest on the mere allegations or denials of his pleadings, but must present evidence which will establish that material facts are still at issue. La. C.C.P. art. 967. Summary judgment procedure is now favored to secure the just, speedy, and inexpensive determination of all except certain disallowed actions.
[i(A plaintiff in a medical malpractice action is required to establish the standard of care applicable to the doctor, a breach by the doctor of that standard of care, a causal connection between the doctor’s alleged negligence and the plaintiffs injuries, and damages. La. R.S. 9:2794(A); Johnson v. Morehouse General Hospital, 10-0387 (La.05/10/11), 63 So.3d 87; Pfiffner v. Correa, 94-0924 (La.10/17/94), 643 So.2d 1228; Prine v. Bailey, 45,815 (La.App.2d Cir.12/15/10), 56 So.3d 330.
In a wrongful death action involving allegations of medical malpractice, a plaintiff may establish a compensable claim through evidence which demonstrates that a defendant’s medical malpractice resulted in the loss of a chance of survival of a patient who thereafter expired. Smith v. State through Dept. of Health & Human Resources, 523 So.2d 815 (La.1988).
Once a breach of duty constituting malpractice is established, the question of whether the malpractice contributed to the death, i.e., lessened the chance of survival, is a question of fact for the jury. Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La.1986). Defendant’s conduct must increase the risk of a patient’s harm to the extent of being a substantial factor in causing the result but need not be the only cause; it need only increase the risk of harm. Id.
Plaintiffs may not rest on the mere allegation or denials of their pleadings but must present evidence that will establish that material facts are still at issue. Proof of causation was an essential element of plaintiffs’ |ncase. There were no experts presented to connect Dr. Crouch’s failure to diagnose cancer to Mr. Amos’s heart problem. Nothing in the record shows that the heart disease was caused by or aggravated by anything Dr. Crouch did or did not do. Thus, the trial court did not err in granting the summary judgment motion.

Conclusion

For the reasons set forth above, the trial court’s judgment is AFFIRMED. Costs are assessed to plaintiffs/appellants.
LOLLEY, J., concurs in the result only.

. In early 2003, CT scans showed bilateral lung nodules. Pre-operative procedures for lung surgery found some blockage and Mr. Amos underwent outpatient left heart cathet-erization to put in a stent on April 28, 2003. He thereafter had cardiac arrest and was maintained on life support until he died.